[No. 36405. Department One. June 13, 1963.]

PAULINE HORNER, *Respondent*, v. NORTHERN PACIFIC BENE-
FICIAL ASSOCIATION HOSPITALS, INC., *Appellant*.[*]

[*] Reported in 382 P. (2d) 518.

*Skeel, McKelvy, Henke, Evenson & Uhlmann*, by *Frederick V. Betts*, for appellant.

*Miracle, Treadwell & Pruzan*, for respondent.

HALE, J.—This action at law is the result of injuries claimed to have been incurred during surgery. The sole question essential to determine this appeal is whether res ipsa loquitur applies.

Respondent, an X-ray technician, was a member of a prepaid medical insurance plan and entitled to medical and hospital care from the appellant which operates a hospital in Tacoma. On June 17, 1957, she entered appellant's hospital as a patient to have a hysterectomy, an abdominal operation involving removal of the uterus.

Respondent was given a preoperative sedative, taken to surgery by cart, and placed on her back on an adjustable operating table. Her right arm was extended to the side on what is called an "arm board" for injection of sodium pentothal and curare, a muscle relaxant, while her left arm was kept at her side and a blood pressure cuff applied to it. Across the top of the left shoulder a padded, metal, crescent-shaped brace, which projects upward from the operating table, was securely fixed to prevent the patient from sliding. Her feet were lowered, by means of lowering the end of the table, and were wrapped in cloth which was then tied beneath the table to prevent sliding in that direction. The patient was placed in what the medical profession calls the Trendelenburg position, that is, feet lowered, head and shoulders slightly lowered, and the abdominal area slightly elevated. Placing the abdominal area on a higher plane than that of the remainder of the body is recognized medically as the approved position for the performance of the type of abdominal surgery called for in this operation.

After placing respondent in the Trendelenburg position, a general anesthetic was administered to her, and the hysterectomy was successfully performed.

When respondent regained consciousness in her hospital room, she became aware of an itching sensation in her shoulder and back. She attempted to move her right arm but found that it was paralyzed. This paralysis of respondent's right arm was described by one doctor as a severe traction brachioplexus neuropathy, and by other doctors as due to an injury of the brachial plexus, probably resulting from trauma or traction or pressure. Plexus, as used here, means a network of interlacing nerves located in the neck, shoulder and armpit, and composed of the front or anterior branches of the first thoracic and lower four cervical nerves running through the forward aspect of the shoulder to the armpits.

Paralysis of the right arm persisted in respondent for a period of over four years in slowly diminishing degrees through courses of medical treatment and series of physical therapy treatments, until the time of trial, October, 1961, by which time most of the symptoms had disappeared. Appellant gave no explanation as to the cause of the injury other than to show that this type of paralysis may be produced by some form of trauma, pressure or traction while a patient is under anesthesia. Respondent's action against the appellant hospital corporation, which operates the hospital and employed all of the medical and nonmedical personnel connected with her surgery, resulted in a verdict of $25,000.

Appellant hospital appeals, urging several assignments of error. Among these is error claimed by virtue of a summary judgment dismissing appellant's affirmative defense to the effect that respondent had, as a member of appellant's predecessor, agreed under its bylaws to absolve any officer, physician or surgeon from any liability caused by negligence or malfeasance. Since appellant here is a successor to the association of which respondent was a member and no such agreement was made by respondent with appellant, we find no error in the trial court's dismissal of this affirmative defense and believe it unnecessary to comment on the legal principles sought to be invoked by this assignment of error.

The case turns on res ipsa loquitur. If the injuries described by respondent to the jury occurred under such circumstances as to warrant application of the res ipsa loquitur doctrine, the judgment should be affirmed. If not, we should reverse.

The instruction upon which this appeal depends reads:

"Evidence is of two kinds—direct and circumstantial. In giving direct evidence, a witness testifies directly of his own knowledge concerning facts to be proved. Circumstantial evidence is proof of certain facts and circumstances from which may be inferred other and connected facts which usually and reasonably follow according to the common experience of mankind.

"The value and weight of circumstantial evidence are to be determined from its character and nature and from its relation to all of the other facts otherwise established by the other evidence in the case. Nothing in the nature of circumstantial evidence renders it less valuable than other evidence.

"In connection with the foregoing, you are instructed that it is for you to determine whether the manner of the occurrence of the injury sustained by Mrs. Horner, and the attendant circumstances connected therewith are of such character as would, in your judgment, warrant an inference that the injury would not have occurred had due diligence and care been exercised by defendant's employees.

"The rule is that when an agency or instrumentality which produces injury is under the control of a defendant or its employees, and the injury which occurred would ordinarily not have resulted if those in control had used proper care, then, in the absence of satisfactory explanation, you are at liberty to infer (though you are not required to so infer) that the defendant, or its employees, were at some point negligent, and that such negligence produced the injury complained of by the plaintiff."[1]

Appellant forcibly argues that the foregoing instruction was error; that this is no case for res ipsa loquitur; that a finding of negligence here was pure speculation; and that

[1]No error was assigned to the form or language of this instruction. We point out though that the use of parentheses around the phrase "though you are not required to so infer" tends to de-emphasize and subordinate the thought expressed. The parentheses should be omitted in the future and different punctuation used.

there was neither proof of negligence in performing the surgery nor evidence that the hospital in any way departed from the standards of care within the community.

We must first ascertain from the facts in the case, rather than from the common experience of mankind, whether respondent's paralysis was of such a nature, or was produced in so unusual a way or under such strange circumstances, as to permit the inference of negligence in its causation without further evidence.

Dr. Wayne Zimmerman, an orthopedic surgeon, testified:

"We always try to posture and position a patient for two things, the position that aids the surgery and for the protection of the patient."

He stated that he has an occasional occurrence of this nature in his own practice but could not determine what caused the injury to the respondent.

Dollie Kindelan, a surgical nurse and anesthetist with a combined experience in both phases of medical work of more than 30 years, and which included services as anesthetist in appellant's hospital for over 20 years, testified that, in her years of participating in abdominal surgery, she had never known a patient to come out of surgery with a paralyzed arm.

Dr. William K. Sata, specialist in neurology, testified that the injury here was due to trauma during surgery; that it came from an external force upon the brachioplexus; and that it was unrelated causally to the abdominal surgery. In his practice, restricted to treatment of the nerves and nervous system, Dr. Sata testified that he saw from three to six injuries of this sort following general surgery during a year.

Evelyn Phillips, a nurse-anesthetist, administered the anesthetic to respondent and testified that she had acted as anesthetist in at least 5,500 operations and, until the case at bar, she had never known a patient to come out of anesthesia with a paralysis or injury to the nerve.

Dr. Edward Anderson, a specialist in general surgery, performed the surgery. He said he had no personal recollection of the operation and the positioning of respondent

on the operating table but, relying upon the medical records of the operation, testified that the operation took an hour and that the table was tilted for about 40 minutes of this time. He stated that certain muscles of the arms and legs could become paralyzed and injury to the brachioplexus produced through faulty positioning of the patient on the operating table. He also stated that injury to the brachioplexus might result from traction on the wrists and pressure on the shoulder regions when a patient, under general anesthesia, is in the Trendelenburg position. He was also of the opinion that external rotation of the extended arm during anesthesia can injure the brachioplexus and produce the injuries described by the respondent.

Dr. Lloyd Durkin, specialist in neurological surgery, stated that this type of injury was not uncommon when a patient is under anesthesia, but later declared that an injury such as this ordinarily does not occur in operations for a hysterectomy. Dr. Durkin pointed out that injuries of this character can happen when a patient, under anesthesia, is transferred to and from the hospital cart and operating table and is returned to bed from surgery. He testified that injuries of this type had happened to his own patients during surgery, but he did not relate the number of times or the frequency thereof.

From this situation, we must ascertain whether the case is a proper one for res ipsa loquitur. The myriad of cases and the accumulation of text material following the first overt application of the doctrine in 1863 have tended to enshroud what seems to be a simple, straightforward assertion of a principle of law in an obscuring mist. A return to the font may dispel the vapor and permit us to see the rule clearly. If the rule was a good one when first declared, and meets the requirements of our day, why not apply it in its pristine context? *Byrne v. Boadle*, 159 Eng. Rep. 299, 2 H. & C. 722.

The essential simplicity of the rule as originally declared has been clouded through failure to understand that the case when argued evoked comment among the judges and counsel because of differences between the allegations in

the declaration and the proof submitted at trial. In this landmark case of *Byrne v. Boadle, supra,* plaintiff alleged that defendant, by his servants, negligently and unskillfully lowered certain barrels of flour by means of a jigger-hoist and machinery attached to defendant's shop; that plaintiff was passing along the highway upon which the shop was situated; and that, because of the negligence of defendant's servants, one of the barrels of flour fell upon the plaintiff causing him injuries. Proof of causation differed substantially from the averments of the declaration. One disinterested witness said that he was passing defendant's shop and that:

> " . . . ' . . . When I was opposite to his shop, a barrel of flour fell from a window above in defendant's house and shop, and knocked the plaintiff down. . . . A horse and cart came opposite the defendant's door. Barrels of flour were in the cart. I do not think the barrel was being lowered by a rope. I cannot say: I did not see the barrel until it struck the plaintiff. It was not swinging when it struck the plaintiff. . . . ' . . . " *Byrne v. Boadle, supra.*

The plaintiff had no knowledge of what had happened as he felt no blow. He was knocked unconscious. Only one other witness described the accident, he simply saw a barrel falling upon the plaintiff. It was admitted at the trial that the defendant was a dealer in flour. Thus, there was no evidence whatever of causation—only of the ultimate event—and on the basis that there was no evidence of negligence, the trial court nonsuited the plaintiff.

The coining of the phrase which expresses the rule came about during colloquy between court and counsel concerning the failure of plaintiff's proof to meet the allegation of his declaration. The colloquy is as follows:

*Counsel:* " . . . there was no evidence that the defendant, or any person for whose acts he would be responsible, was engaged in lowering the barrel of flour. It is consistent with the evidence that the purchaser of the flour was superintending the lowering of it by his servant, or it may be that a stranger was engaged to do it without the knowledge or authority of the defendant."

*Pollock, C.B.*: "The presumption is that the defendant's servants were engaged in removing the defendant's flour; if they were not it was competent to the defendant to prove it."

*Counsel*: "Surmise ought not to be substituted for strict proof when it is sought to fix a defendant with serious liability. The plaintiff should establish his case by affirmative evidence.

"Secondly, . . . these facts do not disclose any evidence for the jury of negligence. The plaintiff was bound to give affirmative proof of negligence. But there was not a scintilla of evidence, unless the occurrence is of itself evidence of negligence. There was not even evidence that the barrel was being lowered by a jigger-hoist as alleged in the declaration."

*Pollock, C.B.*: "There are certain cases of which it may be said res ipsa loquitur, and this seems one of them. . . ."

The *ratio decidendi* of the *Byrne* case supports the rule announced by Pollock, C.B., that is as valid and as needful to our aero-electronic, atomic society as it was to the dawning mechanical age of England in 1863 in the middle of the industrial revolution.

The learned judge stated:

" . . . The learned counsel was quite right in saying that there are many accidents from which no presumption of negligence can arise, but I think it would be wrong to lay down as a rule that in no case can presumption of negligence arise from the fact of an accident. . . . A barrel could not roll out of a warehouse without some negligence, and to say that a plaintiff who is injured by it must call witnesses from the warehouse to prove negligence seems to me preposterous. So in the building or repairing a house, or putting pots on the chimneys, if a person passing along the road is injured by something falling upon him, I think the accident alone would be prima facie evidence of negligence. Or *if an article calculated to cause damage is put in a wrong place and does mischief*, I think that those whose duty it was to put it in the right place are prima facie responsible, and if there is any state of facts to rebut the presumption of negligence, they must prove them. . . . the plaintiff who was injured by it [the falling barrel] is not bound to shew that it could not fall without negligence, but if there are any facts inconsistent with

negligence it is for the defendant to prove them." (Italics ours.)

■ Distilled from the straightforward opinion of *Byrne v. Boadle, supra,* we find the following rule:

Further proof of negligence is not essential to take a case to the jury or to overcome challenges to the sufficiency of the evidence where (1) the accident or occurrence producing the injury is of a kind which ordinarily does not happen in the absence of someone's negligence, (2) the injuries are caused by an agency or instrumentality within the exclusive control of the defendant, and (3) the injury-causing accident or occurrence is not due to any voluntary action or contribution on the part of the plantiff. Prosser on Torts (2d ed.), chapter 7, § 42, pp. 199, 201; *Chase v. Beard,* 55 Wn. (2d) 58, 346 P. (2d) 315.

The foregoing corollaries are direct lineal descendents of the original barrel case, and derive of necessity from this original source. The rule is a good one, and it ought not to be muddled with over-refinement and the casuistry so frequently the by-product of overwriting and overtalking about the same subject. We have declared the rule in near original form, supported by a plethora of authority, in the following language:

"This doctrine constitutes a rule of evidence peculiar to the law of negligence and is an exception to, or perhaps more accurately a qualification of, the general rule that negligence is not to be presumed, but must be affirmatively proved. By virtue of the doctrine, the law recognizes that an accident, or injurious occurrence, may be of such nature, or may happen under such circumstances, that the occurrence is of itself sufficient to establish *prima facie* the fact of negligence on the part of the defendant, without further or direct proof thereof, thus casting upon the defendant the duty to come forward with an exculpatory explanation, rebutting or otherwise overcoming the presumption or inference of negligence on his part. [Citing cases.]" *Morner v. Union Pac. R. Co.,* 31 Wn. (2d) 282, 196 P. (2d) 744.

■ That respondent, all of the surgical and hospital equipment, the drugs administered to her, and the personnel having to do with her surgery, were under the exclusive

control of the appellant is self-evident. Likewise, that her injuries were not due to any voluntary action or contributing factor on her part, considered in light of the fact that before, during and following surgery, respondent was under general anesthesia, is too clear for argument. The principal problem remaining then is whether the injury was so extraordinary as to warrant an inference that it would not occur under these circumstances but for someone's negligence. *Nelson v. Murphy,* 42 Wn. (2d) 737, 258 P. (2d) 472. Granting exclusive control of the instrumentality and eliminating voluntary participation or contribution by respondent to the acts producing the injury, we feel that negligence may then be inferred in three situations without affirmative proof thereof: (1) When the act causing the injury is so palpably negligent that it may be inferred as a matter of law, *i.e.,* leaving foreign objects, sponges, scissors, etc., in the body, or amputation of a wrong member; (2) when the general experience and observation of mankind teaches that the result would not be expected without negligence; and (3) when proof by experts in an esoteric field creates an inference that negligence caused the injuries.

We are of the opinion that the case at bar falls within both the second and third situations. Appellant produced no evidence to show what happened to the respondent or to give evidence of causation, but limited its proof to explanation of the many ways in which such paralysis might be induced during general anesthesia. Thus, appellant gave no explanation of the accident.

Surely, to emerge from abdominal surgery with a paralyzed arm is so extraordinary an occurrence within the general observations of mankind as to raise an inference of negligence that requires both an explanation and proof of nonnegligence to meet. It may well be that surgery to or manipulation of a part of the human anatomy will normally produce drastic symptoms in other parts of the body not related to the situs of such surgery or manipulation, but, if so, we may be sure that this could readily be proved.

Secondly, the medical evidence itself—once the conclusions, which are properly the province of the jury and not of the witness, are eliminated—leaves inference of negligence. Highly competent medical experts testified that injury to the brachioplexus was of traumatic origin under anesthesia, and that this injury was caused in numerous ways: By faulty posturing and positioning of the patient, by rotating the arm while abducted, by movement of the patient while the table was tilted, or perhaps by the application of traction and pressure to the arm or shoulder or both. That this paralysis is extraordinary is shown by proof that a nurse-anesthetist, practicing her profession in this very surgery for over 20 years, had never encountered a case of this kind, and a physician, specializing in treatment in injuries to and disorders of the nervous system, sees only three to six cases of this type in a year. Another witness, a nurse-anesthetist, who had participated in at least 5,500 operations, testified that she had never heard of this result nor had she seen such paralysis resulting from surgery before. Finally, there is the evidence given by a neural surgeon that, in the last analysis, this was an uncommon occurrence and could have happened while transferring the patient under deep anesthesia from the operating table to the surgical cart to the bed. Considering the medical evidence alone, and divorcing it from the common experiences of mankind, we find that it likewise creates an inference that this type of injury would not have been produced but for the negligent acts or overt omissions of someone acting for the appellant in the performance of this operation. Thus, all of these considerations impel us to conclude that the case is within the doctrine announced by *Byrne v. Boadle, supra*, in 1863.

Accordingly, under this rule, there was evidence from which the jury could infer negligence and the verdict is held to be supported by the evidence.

The judgment is, therefore, affirmed.

OTT, C. J., HILL, ROSELLINI, and HUNTER, JJ., concur.