[No. 658-3.    Division Three.    June 6, 1973.]

CLARENCE D. YOUNGER, *Appellant,* v. ANDREW G. WEBSTER, *Respondent.*

*J. P. Tonkoff* (of *Tonkoff, Dauber & Shaw*), for appellant.

*Orville B. Olson* (of *Olson & Olson*), for respondent.

MCINTURFF, J.—

In the year 1863 a barrel of flour rolled out of the window of an English warehouse and into the lives of all tort lawyers. It fell upon a passing pedestrian, who sued the owner of the warehouse for his injuries. At the trial a question arose as to the necessity of some affirmative proof of the defendant's negligence; and in the course of a brief colloquy with counsel, Baron Pollock made use of a familiar and homely phrase. He said, "The thing speaks for itself." Unfortunately, since he was a classical scholar in the best tradition of English judges, he said it in Latin.

From that casual utterance, dignified and magnified by the cloak of the learned tongue, there has grown by a most extraordinary process the "doctrine" of res ipsa loquitur. It is a thing of fearful and wonderful complexity and ramifications, and the problems of its application and effect have filled the courts of all our states with a multitude of decisions, baffling and perplexing alike to students, attorneys and judges.

(Footnote omitted.) W. Prosser, *Res Ipsa Loquitur,* 37 Calif. L. Rev. 183 (1948-1949).

Prior to trial of the above-entitled cause defendant-hospital was dismissed from the case. This is an appeal by the plaintiff from an order granting dismissal of the complaint at the end of his case. The sole issue is whether the doctrine of res ipsa loquitur is applicable.

On January 6, 1969 the plaintiff, a 67-year-old gentleman, went to the defendant-doctor in regard to a hernia condition. Defendant examined plaintiff, found he was in the best shape he had ever seen him, and decided to repair the hernia condition via surgery. A spinal anesthesia was used for the operation.

In administering the spinal, defendant instructed plain-

tiff to be perfectly still. Thereafter plaintiff described the injection as follows:

> When he put the needle in me it was just like a strong electric current went through me; it just straightened me out, and I couldn't have prevented it no way. If there had been four people holding me I couldn't . . . , it was just like lightning from the top of my head to the bottom of my toes.

Although plaintiff had experienced two prior spinals in the 1940's he said he had never experienced anything like that before. A second injection of anesthesia was made without sensory experience to plaintiff. After the operation, and at the time of trial, plaintiff had no sensory feeling from his navel to his knees, was unable to urinate without the use of tranquilizers, and no longer experienced a libidinal urge.

Four medical doctors, including the defendant, testified in plaintiff's case. Defendant is a specialist in surgery; Harold J. Ellner, M.D., is a urologist; T. D. Lahiri, M.D., is a neurologist, and Dr. Garry Boyer is an anesthesiologist. The doctors concluded plaintiff's condition was beyond medical treatment. All testified generally that the results were unusual, *i.e.*, one would not ordinarily expect a permanent sensory loss from a spinal anesthesia.

The rule which governs the trial court and this court in passing on a motion for nonsuit or dismissal at the end of the plaintiff's case is so common that it needs no authority. It reads:

> A challenge to the sufficiency of the evidence, a motion for nonsuit, a motion for a directed verdict, or a motion for judgment notwithstanding the verdict, admits the truth of the opposing party's evidence and all inferences that can reasonably be drawn therefrom and requires that the evidence be interpreted most strongly against the moving party and in a light most favorable to the party against whom a motion is made.

APPLICABILITY OF THE DOCTRINE OF RES IPSA LOQUITUR:

In determining whether res ipsa loquitur is applicable the authorities are in harmony that the following three

factors must be present: (1) the accident or occurrence producing the injury is of a kind which ordinarily does not happen in the absence of someone's negligence, (2) the injuries are caused by an agency or instrumentality within the exclusive control of the defendant, and (3) the injury-causing accident or occurrence is not due to any voluntary action or contribution on the part of the plaintiff. *Horner v. Northern Pac. Benef. Ass'n Hosps., Inc.*, 62 Wn.2d 351, 359, 382 P.2d 518 (1963); *Zukowsky v. Brown*, 79 Wn.2d 586, 488 P.2d 269 (1971); 4 J. Wigmore, *Evidence* § 2509 (1st ed. 1905); W. Prosser, *Law of Torts* § 39 (4th ed. 1971), at 214.

In *Pederson v. Dumouchel*, 72 Wn.2d 73, 81, 431 P.2d 973, 979, 31 A.L.R.3d 1100 (1967) the court described cases in which res ipsa loquitur is available, as follows:

> A case in which the doctrine of res ipsa loquitur applies is a circumstantial-evidence case. In it, the jury is permitted to infer negligence from a result which ordinarily would not have been reached unless someone was negligent. The jury may make the inference of negligence or it may refuse to do so.

There has been undue emphasis on the limitations of the doctrine and too little attention to its basic underlying purpose. The result has been that a simple understandable rule of circumstantial evidence, with a sound background of common sense and human experience, has occasionally been transformed into a rigid legal formula, which arbitrarily precludes its application in many cases where it is most important that it should be applied. If the doctrine is to continue to serve a useful purpose we should not forget that

> the particular force and justice of the rule, regarded as a presumption [inference] throwing upon the party charged the duty of producing evidence, consists in the circumstance that the chief evidence of the true cause, whether culpable or innocent, is practically accessible to him but inaccessible to the injured person.

9 J. Wigmore, *Evidence* § 2509 (3d ed. 1940), at 382; *see also Ybarra v. Spangard*, 25 Cal. 2d 486, 154 P.2d 687, 162 A.L.R.

1258 (1944); *Seneris v. Haas,* 45 Cal. 2d 811, 291 P.2d 915, 53 A.L.R.2d 124 (1955).

The defendant contends that, assuming the result was unusual, one cannot say the results complained of would not occur unless there was negligence involved.

The more specific issue then is: Are there sufficient facts for the trial court, under the res ipsa doctrine, to find that the results of the operation do not ordinarily occur in the absence of someone's negligence?

Appearing in court because of subpoenas, the three medical doctors agreed with defendant, who stated that the residual effects of the operation on the plaintiff do not ordinarily happen. No medical doctor testified for the plaintiff explaining any specific acts of negligence. However, we refer to *Douglas v. Bussabarger,* 73 Wn.2d 476, 438 P.2d 829 (1968) for an explanation of the practical aspects of acquiring expert medical testimony.

There are many medical treatises concerning some of the complications resulting from spinal anesthesia, sometimes called the "spinal block."[1] In addition, there are just as

---

[1] In 1969 the following statement was made: "Although this chapter is devoted to the complications of regional block procedures, this should not be construed to mean that complications following regional anesthesia occur frequently or that this type of anesthesia is more dangerous than general anesthesia, for it is not. In the past, medicolegal action was more likely to occur following a complication from a regional block. Today general and regional anesthesia are equally vulnerable because lawyers and the public are aware that complications from all types of anesthesia may produce for them significant monetary remuneration.

"Therefore, every physician or dentist using a regional block technique is obligated to be fully aware of its inherent dangers. If he does not have the knowledge and facilities to institute effective treatment for the complications of regional anesthesia, he should not employ the technique!" J. Bonica, Regional Anesthesia: Recent Advances and Current Status (1969), ch. 12 at 235, *Complications of Regional Anesthesia,* by D. Moore.

J. Lee and R. Atkinson, A Synopsis of Anesthesia, *Spinal Analgesia* (6th ed. 1968), ch. 16 at 380, *et seq.*

A. Faulconer, Jr. and T. Keys, 2 Foundations of Anesthesiology (1965), *Long-term Follow-up of Patients Who Received 10,098 Spinal Anesthetics,* by R. Dripps and L. Vandam, § 4 at 889, 890: "Spinal anesthesia, an anesthetic technique with great advantages for the

many legal treatises describing the application of res ipsa

patient, surgeon, and anesthetist, is relatively free from the criticism of toxicity and the mortality associated with general anesthesia; on the other hand, the great hazard of spinal anesthesia in the minds of both physician and patient is the possibility of persisting paralysis after the anesthetic effects should have disappeared."

8/1, 2 & 3, W. Dornette, Clinical Anesthesia, Legal Aspects of Anesthesia (1972), *Regional Anesthesia,* ch. 17 at 310, *et seq.*

C. Wasmuth, Anesthesia and the Law (1961), *Spinal Analgesia,* ch. 6 at 55, *et seq.*

G. Thorsen, 95 Acta Chirurgica Scandinavica, supp. 121 (Stockholm 1947), Neurological Complications After Spinal Anaesthesia, and Results from 2493 Follow-Up Cases, *Disturbances to Sexual Function,* at 199.

95 Acta Chirurgica Scandinavica (1947), E. Schlidt, *Low Spinal Cord Injuries Following Spinal Anesthesia,* at 101-31.

N. Ericsson, 95 Acta Chirurgica Scandinavica (1947), *On the Frequency of Complications, Especially Those of Long Duration, After Spinal Anaesthesia,* at 167-91.

J. Michelsen, 2 Neurology (1952), *Neurologic Manifestations Following Spinal Anesthesia,* at 255-59.

J. Braham and A. Saia, *Neurological Complications of Epidural Anaesthesia,* British Medical Journal (1958) at 657-58.

B. Solomon and A. Levene, *Paraplegia Following Epidural Anaesthesia,* British Medical Journal (1958) at 654-57.

K. Urbach, W. Lee, L. Sheely, F. Lang and R. Sharp, *Spinal or General Anesthesia for Inguinal Hernia Repair?,* 190 J.A.M.A. (Oct. 5, 1964).

J. Ponka, 117 Surgery, Gynecology & Obstetrics, *Seven Steps to Local Anesthesia for Inguinofemoral Hernia Repair* (July 1963) at 115, *et seq.*

G. Leaverton and W. Garnjobst, 38 American Surgeon (Nov. 1972), *Comparison of Morbidity After Spinal and Local Anesthesia in Inguinal Repair,* at 691-93.

V. Mandlekar, 25 Anaesthesia (no. 3 July 1970), *Accidental Total Spinal (intradural) Block,* at 393-96.

H. Yaskin and B. Alpers, 23 Annals of Internal Medicine (1945), *Neuropsychiatric Complications Following Spinal Anesthesia,* at 184-200.

G. Schwarz and J. Bevilacqua, 10 Archives of Neurology (1965), *Paraplegia Following Spinal Anesthesia,* at 308-21.

F. Cole, 13 Anesthesiology (July 1952), *A Defense of Spinal Anesthesia,* at 407-15.

F. Redlich, B. Moore and I. Kimbell, 8 Psychosomatic Medicine (Nov. 1946), *Lumbar Puncture Reactions: Relative Importance of Physiological and Psychological Factors,* at 386-98.

C. Dawkins, 24 Anaesthesia (no. 4 Oct. 1969), *An analysis of the complications of extradural and caudal block,* at 554-63.

loquitur to medical malpractice, some specifically involving spinal anesthesia.[2]

In order that a plaintiff be entitled to the benefit of the doctrine of res ipsa loquitur he need not exclude every other possibility that the injury was caused other than by defendant's negligence (W. Prosser, *Res Ipsa Loquitur in California*, 37 Calif. L. Rev. 183, 197-98 (1949)). The conclusion that negligence is the most likely explanation of the accident, or injury, is not for the trial court to draw, or to refuse to draw, so long as the plaintiff has produced sufficient evidence to permit the jury to draw the inference of negligence, even though the court itself would not draw that inference; the court must still leave the question to the jury for reasonable men may differ as to the balance of probabilities (W. Prosser, *Res Ipsa Loquitur in California*, 37 Calif. L. Rev. 183 (1948-1949)). The inference of negligence is not required to be an exclusive or compelling one. It is enough that the court could say that reasonable men could draw it. *Bauer v. Otis*, 133 Cal. App. 2d 439, 284 P.2d 133 (1955).

Our most recent case construing the res ipsa loquitur

[2]E. Swartz, *Malpractice Hazards of Spinal Anesthesia*, 21 DePaul L. Rev. 4 (no. 1, Autumn 1971).

*Res Ipsa Loquitur: A Case for Flexibility in Medical Malpractice*, 16 Wayne L. Rev. 1136 (no. 3 Summer 1970).

A. Broder, *Res Ipsa Loquitur in Medical Malpractice Cases*, 18 DePaul L. Rev. 421 (nos. 2 & 3 Summer 1969).

M. Levine, *Anesthesia—Accidents and Errors*, 18 DePaul L. Rev. 432 (nos. 2 & 3 Summer 1969).

R. Binder, *Res Ipsa Loquitur in Medical Malpractice*, 17 Cleveland-Marshall L. Rev. 218 (no. 2, May 1968).

R. Johnson, *Medical Malpractice—Doctrines of Res Ipsa Loquitur and Informed Consent*, 37 U. of Colo. L. Rev. 182 (no. 2, Winter 1965).

J. Steincipher, *Survey of Medical Professional Liability in Washington*, 39 Wash. L. Rev. 704 (1964).

O. Adamson II, *Medical Malpractice: Misuse of Res Ipsa Loquitur*, 56 Minn. L. Rev. 1043 (1961-1962).

M. Belli, *An Ancient Therapy Still Applied: The Silent Medical Treatment*, 1 Villanova L. Rev. 250 (1956).

W. Prosser, *Res Ipsa Loquitur in California*, 37 Calif. L. Rev. 183 (1948-1949).

doctrine under similar facts is *Douglas v. Bussabarger, supra.* In *Bussabarger* the plaintiff had been operated on for repair of a stomach ulcer, and when she recovered consciousness her lower trunk had lost feeling or sense of touch and she could not move her legs. The court stated the following, at page 482:

> Plaintiff submitted to surgery for the purpose of having a stomach ulcer repaired. After surgery she was paralyzed from the waist down. It is clear to us that this typifies those cases in which res ipsa loquitur applies because mankind's general experience and observation teaches that the harmful result probably would not occur in the absence of someone's negligence. *See Horner v. Northern Pac. Beneficial Ass'n Hosps., Inc.,* 62 Wn.2d 351, 382 P.2d 518 (1963).

The present case comes within the reason and spirit of the doctrine. It is difficult to justifiably disregard the application of the doctrine when a patient submits himself to the care and custody of medical personnel, is rendered unconscious, and receives some injury from instrumentalities used in his treatment. Without the aid of the doctrine, a patient who receives permanent injuries of a serious character, apparently the result of someone's negligence, would be unable to recover unless the doctors and nurses in attendance voluntarily chose to disclose the facts establishing liability.

In the present case the doctrine of res ipsa loquitur is applicable. There is sufficient circumstantial evidence for the jury to be permitted to infer negligence. The testimony of the medical doctors and mankind's general experience teaches that the harmful result probably would not occur in the absence of someone's negligence. *See Horner v. Northern Pac. Benef. Ass'n Hosps., Inc., supra; Douglas v. Bussabarger, supra.* Thus the court erred in dismissing the complaint at the end of the plaintiff's case.

Judgment is reversed and the case is remanded for a new trial.

GREEN, C.J., and MUNSON, J., concur.