[No. 1013-3.   Division Three.   May 9, 1975.]

BETTIE C. FAUST, *Individually and as Administratrix, Respondent*, v. BENTON COUNTY PUBLIC UTILITY DISTRICT No. 1, *Appellant*.

*Gavin, Robinson, Kendrick, Redman & Mays* and *William H. Mays*, for appellant.

*Critchlow, Williams, Ryals & Schuster* and *Eugene G. Schuster*, for respondent.

McINTURFF, C.J.—Defendant appeals from a jury verdict in an action for wrongful death arising out of the electrocution of Mr. Faust.

The Benton County Public Utility District No. 1 (hereafter PUD) purchased the Vernita Rattle Snake Power transmission line from the Bonneville Power Administration in 1965 (hereafter BPA). BPA, under contract with PUD, supplied the electric power for this line. A portion of the line cut through the Hanford Atomic Works and ran along a ridge on the top of Rattle Snake Mountain.

About 12:05 a.m. on December 5, 1971, the alarm bell at BPA rang indicating there was some abnormality in the system. After investigation the BPA dispatcher thought it was in the PUD system. In fact, one of the three transmission wires along PUD's line within the Hanford area was broken. The BPA dispatcher did not think it was serious as the ground in the system might have been caused by a tumbleweed caught in the lines, a leaky insulator, or even a tree lying against the lines.

Faust had worked on the Hanford's security force for several years and was well trained in safety. On December 5 he reported to work at approximately 7 a.m. During the prior evening what appeared to be lights or fires had been seen on Rattle Snake Mountain, but they had not been investigated. Lieutenant Faust, along with Patrolman Lynch, went to investigate at the request of Capt. Novotny. When Faust and Lynch finally found the fires they did not immediately recognize that they were caused by a downed power line. Only when Lynch heard a "buzzing sound" did he notice the downed power line and bring this to the attention of Faust. Lieutenant Faust reported the situation via radio to Capt. Novotny who reiterated Faust's comment that they should stay away from the lines and "sit on it" until others arrived to rectify the problem.

After reporting to Capt. Novotny, Faust and Lynch walked back to the ridge along which the power line ran in order to get more information about the fires. Within a few

minutes Faust was electrocuted. At the time the incident occurred, Lynch had his back to Faust who was standing at the edge of a steep drop-off a few feet away from where the power poles ran. Lynch heard an "Ah" and turned to his right and saw Faust going over the edge of the drop-off with one arm up in the air. There was no other sound from him. The broken conductor was hanging from a power pole and going downhill from where the two stood along the ridge. When Lynch reached Faust's body he was lying uphill about 2 or 3 feet from the wire. Between where Faust originally was last seen and where he landed most of the wire was visible. The wire was lying for some distance on the jagged basalt rocks and went into the snow just up from Faust's left. At no time did Lynch see a change in the position of the wire or see Faust come into contact with it.

The other source of danger was from a flow of current between the ends of the broken conductor. The current's path would have been erratic and unpredictable. Experts testified that there would have been no conventional warning of this danger and someone unschooled in electricity would not have known of it.

Defendant contends that the court erred in giving instruction No. 25.[1] Defendant claims that the doctrine of res ipsa loquitur was not applicable because: (1) this was not the type of injury that ordinarily does not occur in the absence of someone's negligence; and (2) the injury was

---

[1]"You are instructed that it is for you to determine whether the manner of the occurrence of the injury sustained by James S. Faust, and the attendant circumstances connected therewith are of such character as would, in your judgment, warrant an inference that the injury would not have occurred had due diligence and care been exercised by defendant's employees.

"The rule is that when an agency or instrumentality which produces injury is under the control of a defendant or its employees, and the injury which occurred would ordinarily not have resulted if those in control had used proper care, then, in the absence of satisfactory explanation, you are at liberty to infer, though you are not required to so infer, that the defendant, or its employees, were at some point negligent, and that such negligence produced the injury complained of by the plaintiff."

not caused by an instrumentality within the exclusive control of defendant—the alarm system; and (3) the accident was due to the voluntary act or contribution of decedent. Defendant emphasizes that the doctrine was not applicable because proof of injury was equally accessible to both plaintiff and defendant, and that even if it were applicable, the instruction on res ipsa was improper because it failed to include the third element, *i.e.*, that plaintiff's injury was not due to his voluntary act or contribution.

In determining whether res ipsa loquitur is applicable, the following three factors must be present: (1) the accident or occurrence producing the injury is of a kind that ordinarily does not happen in the absence of someone's negligence; (2) the injury is caused by an agency or instrumentality within the exclusive control of the defendant; and (3) the injury-causing accident or occurrence is not due to voluntary action or contribution on the part of the plaintiff.[2] It is apparent that the type of injury here does not ordinarily occur in the absence of someone's negligence; and that the injury was not caused by the alarm system, but by the power lines which were owned and controlled exclusively by defendant.[3]

█ Defendant urges that the doctrine is inapplicable because evidence of the cause of injury was equally accessi-

---

[2]*Accord, ZeBarth v. Swedish Hosp. Medical Center*, 81 Wn.2d 12, 19, 499 P.2d 1 (1972); *Zukowsky v. Brown*, 79 Wn.2d 586, 594-95, 488 P.2d 269 (1971); *McKinney v. Frodsham*, 57 Wn.2d 126, 134, 356 P.2d 100 (1967); *Younger v. Webster*, 9 Wn. App. 87, 90, 510 P.2d 1182 (1973); W. Prosser, *Handbook of the Law of Torts* § 39, at 214 (4th ed. 1971).

[3]This condition simply requires that: "[T]he apparent cause of the accident must be such that the defendant would be responsible for any negligence connected with it." Prosser, *Res Ipsa Loquitur in California,* 37 Cal. L. Rev. 183, 201 (1949), and that there is no irrefutable proof that the accident was due to the voluntary act or contribution of the decedent. The plaintiff's evidence need not preclude the possibility that defendant can establish a defense based on plaintiff's conduct. The doctrine may be applied even though the plaintiff's evidence could not exclude the possibility that the injury was caused by negligence other than the defendant's. *Younger v. Webster,* 9 Wn. App. 87, 93, 510 P.2d 1182 (1973); Prosser, *Res Ipsa Loquitur in California, supra* at 197-98.

ble to both plaintiff and defendant. *Morner v. Union Pac. R.R.*, 31 Wn.2d 282, 291-92, 196 P.2d 744 (1948). In *Morner*, two vehicles collided while engulfed in a cloud of steam emitted from a train passing parallel to their route of travel. The court concluded that the doctrine of res ipsa loquitur was inapplicable because the injury to plaintiffs was the result of a collision between two motor vehicles operating independently of the locomotive. The defendant in *Morner* did not have exclusive control over the operation of either of the two vehicles. In the instant case, defendant clearly had exclusive control over the power lines. Similarly, *Hughes v. Jolliffe*, 50 Wn.2d 554, 313 P.2d 678 (1957), may be distinguished because in that action neither party knew "who or what shifted the car's gear into neutral," causing the accident. And plaintiff has not introduced substantial evidence that a third party—BPA—was negligent, making it impossible to say that the injury would not have occurred but for some negligence on defendant's part.[4] Accessibility to the explanation of an accident is not a controlling factor and is at best a make-weight argument.[5] Equal accessibility to the cause of the accident is not precluded by *Younger v. Webster*, 9 Wn. App. 87, 94, 510 P.2d 1182 (1973). In dictum the *Younger* court concluded that the reason and spirit of the doctrine applies where a patient does not have access to the cause of injuries known only by the treating physicians and staff.

█ █ Defendant cites no authority for the proposition that the instruction constituted reversible error because it failed to include the third element for application of the doctrine. Instructions must be read as a whole, and if the defendant's theory of the case can be adequately argued under the other instructions, error, if any, is ordinarily not prejudicial.[6] The jury was given other instructions on con-

[4]*McKinney v. Frodsham*, 57 Wn.2d 126, 135, 356 P.2d 100 (1967).

[5]W. Prosser, *Handbook of the Law of Torts* § 39, at 225 (4th ed. 1971).

[6]*Balandzich v. Demeroto*, 10 Wn. App. 718, 723, 519 P.2d 994 (1974).

tributory negligence, and defendant's counsel argued strenuously that the accident was due to the voluntary action or contribution of the plaintiff. If the jury had found plaintiff to be contributorially negligent that fact would have acted as a complete bar to plaintiff's recovery. Under these circumstances, the instruction on res ipsa loquitur constituted harmless error.

Pursuant to RCW 2.06.040, the remaining contentions and the court's answers to those contentions, having no precedential value, will not be published.

Judgment of the trial court is affirmed.

GREEN and MUNSON, JJ., concur.